THE FIDELITY TRUST COMPANY

*v.*

HOBOKEN AND MANHATTAN RAILROAD COMPANY et al.

[Argued January 9th, 1906. Decided March 6th, 1906.]

A plot of land belonging to a street railway corporation, and used in the prosecution of its business of carrying passengers, which was included in a mortgage of the whole plant and franchises of the railway

corporation, was leased by it for nine hundred and ninety-nine years, so that the lessee acquired exclusive rights to the surface of a large portion of the plot and underground privileges. The railway corporation reserved thereby a portion of the plot for the use of its surface system of railways, and was entitled, under the lease and contract, to maintain elevated tracks thereon for the use of its elevated system of railways in substantial compliance with a plan accompanying the lease and contract.—*Held,* (1) that while a mortgagor or an owner of premises subject to a mortgage is entitled to manage, control and dispose of the mortgaged premises at his pleasure, yet a mortgagee thereof may demand relief against the mortgagor or his assigns, owners of the mortgaged premises or lessees thereof, if their acts, if carried out according to their contracts and proposed plans, will operate to depreciate the value of the property upon which the mortgage is security; (2) a mortgagee, with a mortgage on the plot of land above mentioned, may obtain relief against the execution of the plan proposed by the lease and contract between the present owner and the lessee, if the plan tends to diminish the power of the street railway corporation to operate its plant under its franchises with profit.—*Held further,* (1) the mortgagee of the plot has no ground for complaint of a lease of part thereof, on the ground that thereby the railway corporation has debarred itself from enlargement of its terminal facilities, although such enlargement seems to be desirable and is claimed to be necessary in the near future; a mortgagee accepts the security as it was when the mortgage was made, and while he may have been influenced in accepting it by a reasonable expectation that the interest of the mortgagor would require betterments which would increase his security, yet he acquires no right to require any such betterments, and has not been really injured by the present owner divesting itself of the right to make betterments; (2) when the owner of such a plot subject to a mortgage which includes the plant and franchises of a railway corporation, which plot is necessary for the profitable use of the railway corporation in the conduct of its business, leases portions of the tract to another corporation which proposes to make use of the same, in part, for a traffic in carrying passengers, which competes with that carried on by the railway corporation, a case of threatened injury and deterioration of the mortgaged premises is presented, which justifies relief; (3) where the plan proposed by the parties to the lease and contract for the continued working of the cars of the railroad corporation is shown to be incapable of being carried out without the acquisition of additional land for the support of elevated tracks, and the railway corporation has no power to acquire the right to erect or maintain such tracks by condemnation of the right of property owners, if the tracks are projected to be elevated upon private property, and has no right to erect or maintain the same if projected to be erected upon property subjected to the use of a public highway, without the consent of certain of the property owners and of the municipality; and where, if the elevated tracks thus planned cannot be erected and maintained, the railway corporation would be compelled to arrest its cars and deliver its passengers at a distance from a ferry which is now contiguous to said plot, or to make use of

elevated stub tracks upon the plot, which are conceded to be inefficient, a case of impairment and deterioration to the mortgaged premises is exhibited, for which the mortgagee may have relief.—*Held further,* that the corporation holding in trust the mortgage securing bondholders may assert its right to relief against deterioration of the security of the mortgage, notwithstanding some of its directors are also directors in the railway corporation which has executed the lease and contract complained of, or in a corporation which is a large stockholder therein, the relief sought being for the protection of bondholders who are *cestui que trustent.* The lessee asserts, by its answer, that the bonds secured by the mortgage in question have matured, and offers to pay the same on demand. The complainant asserts that the bonds have been extended by an agreement, and are not now due.—*Held further,* that the right of the lessee to redeem should be asserted by tender and by a proper bill for redemption.

On motion to dissolve injunction, &c.

*Messrs. Collins & Corbin,* for the motion.

*Mr. Samuel W. Beldon* and *Mr. Robert H. McCarter, contra.*

MAGIE, CHANCELLOR.

The bill in this cause is filed by the Fidelity Trust Company, the complainant, as the holder in trust of a mortgage upon certain property and franchises now belonging to the Jersey City, Hoboken and Paterson Street Railway Company, and it states that the mortgage secures bonds, issued and outstanding, to the amount of $1,291,000. It further states that there are mortgages securing bonds outstanding to the amount of $2,998,000 upon said property and franchises, which are prior liens to the mortgage held by the complainant. The bill makes parties defendant the Hoboken and Manhattan Railroad Company, a corporation of the State of New Jersey, and the New York and Jersey Railroad Company, a corporation of the State of New York (which two companies are engaged in the construction of tunnels under the Hudson river between New Jersey and New York); the Jersey City, Hoboken and Paterson Street Railway Company, and the Public Service Corporation of New Jersey.

The bill prays relief by an injunction restraining the Hoboken and Manhattan Railroad Company and the New York and Jersey

Railroad Company from committing waste or destruction upon the premises covered by the complainant's mortgage by making excavations thereon and removing the tracks, buildings or other property thereon.

Upon filing the bill with its accompanying affidavits, an injunction issued according to its prayer.

The Hoboken and Manhattan Railroad Company and the New York and Jersey Railroad Company have filed an answer, with accompanying affidavits, and given notice of a motion to dissolve the injunction. The motion has been brought to hearing upon the bill and affidavits, the answer and affidavits, and rebutting affidavits presented by the complainants.

It may be premised that the question presented in this cause is in no respect affected by conclusions reached in any of the litigations between the answering defendants and the Jersey City, Hoboken and Paterson Street Railroad Company, or any of the stockholders thereof, respecting their contractual relations under the instrument hereafter described. This bill is one by a mortgagee seeking to stay waste which, it avers, will diminish the security of the mortgage of which it is trustee.

It may also be premised that since complainant occupies the position of a mortgagee, holding a mortgage in trust for the protection and security of bondholders, its position and its duty as such trustee cannot be affected by the fact that some of its directors are also directors in the Jersey City, Hoboken and Paterson Street Railway Company, or in the Public Service Corporation, or are stockholders of either company. If an impairment of the mortgage security is shown sufficient to require equitable relief for the protection of the bondholders, the complainant not only has the right, but it is its duty, to protect those for whom it holds the mortgage in trust.

Among the various matters pressed upon my consideration as disclosing an impairment of the complainant's security in the nature of waste are the following:

*First.* It is claimed that the act of the defendants which is complained of, and which will be hereafter more particularly described, will prevent the Jersey City, Hoboken and Paterson

2

Street Railway Company, the owner of the property and franchises included in the mortgage, from extending its terminal facilities at Hoboken, as required by its present and prospective needs, and as necessary to preserve its traffic and profits.

*Second.* It is claimed that the defendants the Hoboken and Manhattan Railroad Company and the New York and Jersey Railroad Company are engaged in securing rights to construct a system of street railroads in Hudson county, to be connected with a terminus proposed to be made on lands covered by the mortgage, under contracts between the defendants, and which railroads, when so connected, will compete for the carriage of passengers with the railroads upon which complainant's mortgage is secured.

*Third.* It is further claimed that the scheme and plan entered into by the defendants is impracticable, or cannot be put into operation without paralyzing, or rendering wholly or partially useless, at least a part of the system of railroads on which complainant's security depends.

The answering defendants, by their answer, deny that they are engaged in securing rights to construct street railroads to be connected with the terminus and their tunnel railroad, and also deny that their plans will destroy or tend to destroy the value of the terminal tract, or tend to diminish the security of complainant's mortgage.

The facts upon which these questions are presented must be briefly stated. The mortgage of complainant covers a plot of ground in Hoboken which I will call the terminal plot. It is four-sided, but of irregular shape. On the west it bounds upon Hudson street for about two hundred feet; on the south it adjoins the Delaware, Lackawanna and Western Railroad Company's land for about six hundred feet; on the east it adjoins the property of the Hoboken Ferry Company for a little over fifty feet, and on the north it adjoins lands which, on the maps presented on both sides, are marked as "Hudson Place," for about six hundred feet. Upon this terminal plot and along its south side, close to the Delaware, Lackawanna and Western Railroad Company's land, the tracks of what I shall call the surface system of the Jersey City, Hoboken and Paterson Street Railway

Company run .easterly for about its whole length, and then, turning by two loops, pass into Hudson Place, and so proceed westerly. One of the above-described loops is not only partly on Hudson Place, but also partly on the property of the Hoboken Ferry Company.

The tracks of what I shall call the elevated system of the Jersey City, Hoboken and Paterson Street Railway Company come from the west to the terminal plot, reaching it at present upon the surface, and then run easterly along it, and, by a loop partly on the terminal plot, but extending out into Hudson Place, return to the terminal plot and pass westwardly on its surface to Hudson street, where they begin to ascend to the elevation on which that line is built. It will, therefore, be observed that at present the elevated system is upon the surface of the terminal plot. There are also upon its surface, in connection with that system, other tracks, called stub tracks, but they do not seem to be commonly or frequently used.

From this description it will be observed that the terminal plot covered by complainant's mortgage does not include part of the loops, either of the surface system or of the elevated system. The loop that is within the property of the Hoboken Ferry Company seems to be affected by an agreement made between that company and the North Hudson County Railway Company, a former owner of the terminal plot, to the effect that in case of the erection by one of the parties of any viaduct or·structure upon the lands of the other, the occupancy thereof should be considered to be by parol license only, which may be revoked by the owner of the lands upon ninety days' notice.

There is also in the case an agreement, dated September 1st, 1876, between the Hoboken Land and Improvement Company and the North Hudson County R .;lway Company which recites that the last-named company had built certain tracks over lands of the Hoboken Land and Improvement Company, on lands lying between two streets, one of which is claimed to be that now designated on the maps as Hudson Place. The description is so vague that I find it impossible to identify it from the evidence or maps. The agreement, however, seems to show that whatever land was intended, the Hoboken Land and Improvement Com-

pany claimed at that time that it was private property and not a public street, but it also shows that there was then in existence some right to use the same under an agreement previously entered into between the said companies, which agreement is not in the case.

As stated in the bill, and admitted by the answer, it appears that on the 8th of April, 1904, the Jersey City, Hoboken and Paterson Street Railway Company, with the consent and approval of the Public Service Corporation, executed an indenture which recites that the Jersey City, Hoboken and Paterson Street Railway Company owns in fee the tract of land in question, and operates across a portion of it certain elevated railroad lines and certain railroad lines upon the surface, and that the Public Service Corporation controls said railroad lines and terminals, and other elevated and surface lines which it is now operating, and further recites that the New York and Jersey Railroad Company is building a tunnel from New York to Jersey City, and the Hoboken and Manhattan Railroad Company proposes to construct a tunnel railroad from a connection with the tunnel railroad of the New York and Jersey Railroad Company to a point in or near the tract of land in question, and the Jersey City, Hoboken and Paterson Street Railway Company, with the consent and approval of the Public Service Corporation, thereby grants and leases for nine hundred and ninety-nine years unto the Hoboken and Manhattan Railroad Company the easement and right to construct and operate its railway and terminal station, either upon the surface, or beneath the surface, or above, upon a described parcel of land which is included in the tract which I have called the terminal plot.

The lease does not include the whole of the terminal plot. It leaves a strip of fifteen feet in width along its south edge and a small portion on its east edge, next to the Hoboken Ferry Company's land, upon which it is proposed that the surface tracks of the surface system shall hereafter continue to run, turning within the lines of the land reserved from the lease, by three loops, out into Hudson Place, upon the surface. None of those three loops appears to impinge upon the land of the Hoboken Ferry Company. All the rest of the terminal plot is included

in the lease, and without going further into detail, it is sufficient to say that the tunnel company acquired by this indenture the exclusive right to the whole surface of the plot leased, and all that is beneath the surface, subject to the right of the railway company to construct and maintain elevated tracks, which right is reserved to the railway company for the tracks of its elevated system only, keeping them at an elevation that will suffice to clear the cars of the tunnel company upon the surface. The parties agree by lease that the reconstruction of both surface and elevated tracks is to be done substantially as shown upon a map annexed thereto. The reconstructed surface tracks are shown thereon as above described. The reconstructed elevated tracks are shown as extending along the leased land in two lines; that for the eastbound traffic continues for some distance thereon and then bends to the south and enters upon the unleased strip of fifteen feet in width; it then turns to the north with four curves or loops having each a radius of forty feet, all of which loops enter upon the land marked Hudson Place, and continuing the same curve, the lines again enter upon the leased land, and joining, form the westbound track.

The lease contains provisions for substantial rent to be paid by the lessee, and stipulation whereby, after reciting that in order to give the tunnel company the possession and use of the leased track it will be necessary to relocate and reconstruct the railway company's tracks, the tunnel company agrees to pay the actual net cost thereof.

This statement of the situation will tend, I trust, to make clear my conclusions upon the important matters submitted upon this motion.

In respect to the claim that the owner of the property and franchises upon which complainant's mortgage rests, which owner I will call the railway company, by its agreement (called a lease) with the companies, which I will call the tunnel companies, has debarred itself for nine hundred and ninety-nine years from extending or enlarging its terminal facilities to meet its present and prospective needs and preserve the traffic out of which its profits must be expected, I conclude that a mortgagee is not entitled to an injunction against carrying out the agree-

ment upon that ground. His mortgage is secured upon the property as it was when the mortgage was executed. As to improvements afterward to be made, a mortgagee may reasonably anticipate that the mortgagor or subsequent owner will use the premises in a way best adapted to promote his interests, and if any such permanent betterments are made, the mortgagee is benefited. But the mortgagee retained no right to require the mortgagor or any subsequent owner to improve the property, or to manage it in any particular way. A mortgagor is free to deal with the mortgaged premises according to his own views of his own interests, always provided that what he does will not materially impair the value of the property as security for the mortgage.

In this case the railway company, which is the owner of the mortgaged property, with the assent of its largest stockholder, has voluntarily contracted to permit the tunnel companies, in consideration of an expenditure in the rearrangement of the terminal plot, which must be very large, and of rentals amounting to considerable sums, to occupy, for a period of nine hundred and ninety-nine years, the larger part of the terminal plot. It must be assumed that the railway company deemed it to its interest to make such an arrangement for the use of the terminal plot for the exchange of passengers proceeding to New York or coming from New York by the tunnels when completed. With the wisdom or unwisdom of that contract the mortgagee has no concern, unless the contract, if carried out, will impair the security of the mortgage.

The second claim of complainant in support of the injunction presents a question of much greater importance and of corresponding difficulty. The charge of the bill is that the defendants are engaged in a project to construct a system of street railroads in Hudson county to be connected with the terminus which the tunnel companies acquired under the so-called lease, which system of street railroads will compete with the railroads formerly belonging to the North Hudson County Railway Company, and which now belong to the Jersey City, Hoboken and Paterson Street Railway Company, and form a part of the security of complainant's mortgage, whereby the income from those

railroads will be diminished, and the mortgaged property and franchises will be depreciated in value. This charge, supported by affidavits, was one of the grounds upon which the injunction which it is now sought to dissolve was allowed.

It is unnecessary, but perhaps proper, to say that the injunction was not allowed upon any theory that this court can intervene to protect a corporation or an individual from competition in business. In the early stages of railroad building and of manufacturing enterprises dependent on water power it was indeed deemed to be for the interest of the state to foster such works by securing those engaging in them from competition, more or less extensively. But that policy has long been abandoned in favor of free competition, not only of individuals, but of corporations. This policy is now written in our constitution, recognized by our legislature and enforced by the courts, except when the act producing competition is one which violates some right or is contrary to some duty. The railway company, having voluntarily made the lease and contract, obviously cannot complain if the tunnel companies make use of the privileges which have thus been given to compete with them for the passenger traffic which affords the profit of the railway company. But it may be otherwise with respect to a mortgagee of such property and franchises, which are thus shared, as it were, with others who are competitors. When the rails of a street railway company, laid in a public highway under authority of law by a corporation having franchises to operate cars for the carriage of passengers thereon, were habitually and persistently used by a line of street coaches for the carriage of passengers in competition with the railway company, this court approved of an injunction that required the coach company to cease such constant and habitual use of the rails in competition with the traffic which the owners of the rails carried on. *Citizens' Coach Co.* v. *Camden Horse Railroad Co., 33 N. J. Eq. (6 Stew.) 267.* In my judgment, it must necessarily follow that if the railway company in that case had made an agreement with the coach company to permit it to use its rails in the manner described, habitually and persistently, and in competition with the traffic of the railway company, while the railway company might be bound, yet a

mortgagee of the property and franchises of the railway company might well assert that such conduct tended to depreciate the value of the mortgaged premises and franchises and to impair his security, and this whether or not the railway company acquired from the coach company a yearly rental which it conceived was adequate compensation for the use of the plant and for the injury done by competition with the traffic. In respect to such a contract the mortgagee might well say, "I am entitled to my security as it is, and you have no right to impair it by contracts which affect not only the property which secures me, but the franchises which are necessary to make and retain the value of the property."

This view is applicable, in my judgment, to the situation as it is presented by the bill. The terminal plot which I have described is part of the mortgaged plant on which the railway company, the present owner of the mortgaged premises, operates its passenger railways under franchises which the mortgagee also holds as security. If the present owner has contracted to give the rival companies a part of the property to be used in competition with it for the traffic which gives it profits, I think the mortgagee may enjoin the carrying out of such a contract, because as made it tends directly to diminish his security. The only question is whether the case made by the bill is met by the denial in the answer of the defendants the tunnel companies.

By their answer the tunnel companies deny that they are engaged in securing rights to construct a system of railroads in the county of Hudson to be connected with said terminus. In this respect the answer is supported by the affidavit of Mr. McAdoo, the president of both tunnel companies. He thereby swears that it is not true that the tunnel companies are engaged in securing rights to construct a system of street railroads in Hudson county. But he connects his denial with the statement that a company called the Hudson Street Railroad Company has been formed to construct street railroads in Hudson county, and some of its routes are planned to connect with the defendants' tunnel railroad, and that the company (the Hudson Street Railroad Company) will in some of its routes compete with the railroads controlled by the Public Service Corporation. While

he also states that the Hudson Street Railroad Company had not been formed when the lease was made, and is not controlled by the tunnel companies, but is a separate enterprise, he adds that the tunnel companies are seeking to make convenient connections with all street and other railroads in Hudson county.

Among the matters presented by the rebutting affidavits is a slip taken from a newspaper published in Jersey City, containing questions addressed to the people of Hudson county and statements and promises made by the Hudson Street Railroad Company. It purports to be signed by the Hudson Street Railroad Company, by Mr. McAdoo, as president. Reading the affidavit of Mr. McAdoo by itself, however, I feel compelled to admit that it justifies the inference that there is a purpose on the part of the tunnel companies to make use of the plant acquired by the so-called lease, and to permit the use of the underground terminus proposed to be formed therein, and the way thereunder to the tunnels when completed, by companies operating street railways in competition for the traffic which the railway now enjoys.

However beneficial to the public such competition may be, a mortgagee may well object to the devotion of a part of the plant which is his security, and that part the key of the system, to the use of other companies whose competition must affect the revenues out of which his interest, and eventually his principal, must come. Reading the answer of the tunnel companies and the affidavit of Mr. McAdoo, I am not prepared to say that the charge of the bill in this respect is met.

Lastly is to be considered the claim of complainant that the rearrangement of the terminal plot in the manner permitted by the so-called lease, and indicated substantially by the map annexed thereto, deprives the railway company of the use of the surface thereof for its elevated system, and provides for that system no other mode of utilization except one that involves the use of land to which the railway company has no title, and upon which, so far as this case shows, it has no right to construct an elevated structure for street railroads. It is a conceded fact that the elevation of the elevated system over this terminal plot can only be successful by the use of the suggested loops, which necessarily extend over and require a support in Hudson Place. It is

true that the leased premises may be utilized by stub tracks for the elevated system, but it is apparent that such tracks will not be sufficient for its present traffic, nor for the performance of its public duty in the carriage of passengers.

Whether the land within the strip marked Hudson Place is mere private property unaffected by any public right of use, or whether it has become a public highway in which the public has rights, is not discoverable from the case presented. The indications point to its being a public street. It is true that there is no proof of laying it out for public use, or of any dedication by the owner, or of any acceptance by the corporate authorities of Hoboken. But public highways may result from long-continued use of land by the public in the manner in which public highways are used, and in the case presented there appears to have been a user by the public, and along it the railway company has laid and maintained its rails and run its cars in the carriage of passengers for a long time.

But if Hudson Place is private property, can the railway company acquire a right to erect thereon an elevated structure for the loops of its elevated lines, as contemplated by the so-called lease? It has, undoubtedly, all the rights and powers that the companies had which it has acquired by merger or otherwise. One of the companies whose rights and powers this railway company now possesses was the Hoboken and Weehawken Horse Railroad Company, which was incorporated by an act approved February 1st, 1860. *P. L. 1860 p. 68.* That company was given the power of taking land by condemnation. The grant is contained in section 7 of the act. But the same section requires the company to determine the route and location of the railroad and to deposit a survey with the secretary of state before entering upon the lands or laying its rails, &c. In my judgment, the power of condemnation conferred on the Hoboken and Weehawken Horse Railroad Company cannot now be exercised in condemning additional land at the place in question. The terminus of the road has been fixed, as the act permits, "at or near the ferry gates," and the route of the road has been for many years determined, built upon and operated. There is no power found in the act to extend or enlarge, or to use the power of

eminent domain for extension.   Furthermore, the power was given for the purpose of a surface and not an elevated road.

If it be assumed that I am right in attributing to Hudson Place the qualities of a public highway, the right to use it for the erection and maintenance of the supports of an elevated railroad can only be acquired under the provisions of the "Act to enable street car or horse railroad companies to provide better accommodation to the public by using what is now known as the cable system for motive power on elevated roads," approved March 26th, 1886 (*P. L. 1886 p. 126*), as amended by a supplement thereto approved April 6th, 1888.   *P. L. 1888 p. 388.* Without going into unnecessary details, it is sufficient to say that by these legislative provisions no elevated road can be constructed on a street unless (1) by the consent in writing of the owners of one-half of the property fronting on such street; (2) all damage, if any, to property fronting on such street, the owners of which have not given their consent, shall first be ascertained and paid, and (3) the consent of the municipal authorities be first obtained.

It will be observed, then, that if the plan for the rearrangement of the terminal plot agreed upon by the owners thereof with the tunnel companies be carried out, the railway company now using the same under franchises, to accommodate the tracks of its elevated system, may be wholly prevented from continuing that traffic thereon in the contemplated mode, *i. e.,* by loops. If Hudson Place is mere private property, no power to condemn appears; if it is a public highway, the right to use it for the elevated tracks may be prevented by the failure to obtain the consents requisite to their erection thereon.   It is true that if the railway company finds itself unable to carry out the plan for these reasons, it may still bring its passengers and discharge them at a point before the terminal plot is reached, or it may deliver them upon the terminal plot at an elevation and conduct the business by means of stub tracks; but it is conceded, and is entirely obvious, that the traffic of the railway company, by either plan, would be seriously affected, to its injury.   Injury to the traffic involves, of course, diminution of profits, and there-

fore diminution of the power to pay the interest or the principal of the large encumbrances upon this property.

Relief against injury to the inheritance, which is called waste, when sought by those entitled at common law, or under the statutes of Marlbridge and Gloucester (*Moore* v. *Townshend, 33 N. J. Law (4 Vr.) 284,* may be demanded for reasons which will not justify relief for a similar injury done or threatened by a mortgagor. In the latter case it is not for injury done to the inheritance that the mortgagee may intervene, but for injury done or threatened to his security. A mortgagor in possession is the owner of the estate, and may exercise all rights of ownership, and even commit waste, provided he does not diminish the security or render it insufficient. *Kerr Inj.* § *262; Tate* v. *Field, 57 N. J. Eq. (12 Dick.) 632.* For an injury to his security by waste, a mortgagee may have an action on the case for damages. *Jackson* v. *Turrell, 39 N. J. Law (10 Vr.) 329; Schalk* y. *Kingsley, 42 N. J. Law (13 Vr.) 32.* The mortgagee may invoke the restraining power of a court of equity to prevent injury to his security by waste being actually committed or threatened. *Kerr Inj.* § *235; 3 Pom. Eq. Jur. 1345.* For trivial acts of waste the courts will not interfere, but when the mortgagor's security is upon the plant and franchises of a corporation engaged in the *quasi* public business of carrying passengers by means of the mortgaged premises, and when it is made to appear that a course of conduct is threatened by the mortgagor, and others with the mortgagor's connivance and consent, and about to be pursued, which, it may reasonably be inferred, may result in preventing or diminishing the power to make profitable use of the plant under the franchises, a case is made which, in my judgment, justifies the intervention of the mortgagee and requires this court to intervene to protect his interests. It is unnecessary to add that a trustee holding a mortgage in trust for bondholders is entitled to similar relief.

But it is urged in behalf of the defendants that no injunction ought to issue, because it is shown by competent evidence that complainant's mortgage covers the whole railway system of the railway company, and that if the line which I have called the elevated system were wholly eliminated, the remaining several

lines unaffected by the so-called lease, at present valuations, are a sufficient security both for the mortgage held by complainant and the two mortgages which are prior thereto. In the same connection it is further urged that the complainant, by the contract between the railway company and the tunnel companies, which requires the latter to expend a vast amount of money in the rearrangement of the terminal plot, and to make annual payments of large sums as rental, not only does not have its security diminished by the proposed rearrangement, but that the security is actually increased thereby. The claim is that the waste, if it be such, is of the kind which the old cases called "meliorating waste," and that the complainant's security is not diminished, or even imperilled.

With respect to the claim that the remaining mortgaged premises afford, and will afford, ample security for complainant's mortgage, it is obvious that the claim rests not only upon the present value of the remaining portions, but upon the prospective value thereof, if the rearrangement of the terminal plot is made and operates to prevent or diminish the use of the elevated system thereon. The value of property of this sort is not easy to be ascertained. Resort is necessarily had to expert evidence, and in this case affidavits are presented, on both sides, of persons who claim to have acquired experience in respect to such value. Whether the affidavits disclose experience which justifies reliance upon their estimates of value or not, it is apparent that there is a decided difference of opinion as to the relations of the other portions of the mortgaged railways with that affected by the question discussed in this case, and also with respect to their present value and the effect which will be produced upon them by the carrying out of the proposed plan. I am unable to find proof that if the proposed plan is carried out, the security of complainant's mortgage will not be diminished.

With respect to the claim that what is proposed to be done upon the terminal plot will be a betterment which will make up for any suggested diminution, it is obvious that the claim rests upon the success of the tunnel companies in establishing a transit to New York by way of tunnels. Whatever may be the prospect of success in this enterprise, I think that a mortgagee may object

to losing, in whole or in part, a security with which he is satisfied, and accepting in its place a security dependent upon contingencies, and which he is not required to accept on the opinion of others.

It is further urged on behalf of defendants that the relief by preliminary injunction, even though otherwise appropriate, should not be granted, because the complainant delayed in presenting its·objection to the carrying out of the plan devised between the owner and the tunnel companies, and during that delay the tunnel companies expended money upon the construction of its tunnels, which expenditure would not otherwise have been made.

It appears by the affidavit of Mr. McAdoo that after April 8th, 1904, the date of the so-called lease, the tunnel companies expended money, the amount of which is not stated, in acquiring a right of way for their tunnel under the yard tracks and main line of the Delaware, Lackawanna and Western Railroad Company, and that the tunnel companies prosecuted the construction of their tunnels. Whether the complainant had notice of the execution of the so-called lease because, as claimed, some of its directors were also directors of the Jersey City, Hoboken and Paterson Street Railway Company, and whether such notice would cast a burden upon a trustee mortgagee to immediately act for the protection of its bondholders, are questions which I do not think need be answered. If it be assumed that the complainant had notice of the so-called lease, it was not, in my judgment, under any obligation to protect its *cestui que trustent* or to attack the tunnel companies until the latter entered upon the mortgaged premises and commenced to carry out the rearrangement of the terminal plot, of which complaint is made. It appears that the bill was filed very shortly after excavations were begun.

The bill discloses that the bonds secured by the mortgage of which complainant has become trustee became due on May 1st, 1904, and it asserts that the payment thereof was extended for the period of twenty years. The answer of the moving defendants sets up that they became, by virtue of the lease and contract of April 8th, 1904, entitled to redeem the mortgage at its

maturity on May 8th, 1904; that they had no notice of the agreement to extend the bonds secured thereby, and they tender themselves ready to take up and pay any and all of the bonds on demand. They contest the right of complainant to prosecute this suit for the protection of the bondholders whose bonds defendants claim the right and are ready to pay. There is no cross-bill or answer in the nature of a cross-bill seeking to redeem the mortgage of complainant. There is no offer to pay into court the sum due on the bonds which matured May 1st, 1904. No tender of that sum is alleged.

A tenant for years has a right to redeem. *Hamilton* v. *Dobbs, 19 N. J. Eq. (4 C. E. Gr.) 227.* But there is no right to redeem before the mortgage is due. *Jones Mort.* § *1052.* Complainant contends that this mortgage is not now due, and will not become due until the expiration of twenty years from May 1st, 1904. Defendants insist that it is now redeemable because these defendants did not consent to its extension.

I do not deem it necessary to determine the questions thus raised. The bonds secured by the mortgage have not been paid. The holders are entitled to the security of the mortgage until paid. Complainant, as trustee, is bound to prevent the impairment of the security. If defendants desire to pay the bonds, they can raise the question of their right to do so by tender and by a bill to redeem. Until there is payment in one or the other mode, the complainant's duty to protect the security remains.

The result of my examination leads me to the conclusion that the injunction should be retained. The motion to dissolve is denied.