The bill of complaint filed herein sought the foreclosure of a real estate and chattel mortgage for $125,000, given by the defendant Morris Handle and his wife to the Camden Safe Deposit and Trust Company, the complainant's predecessor trustee. The mortgage was dated February 20th, 1930, covered premises located on Broadway, Camden, New Jersey, known as the Towers Theatre, and was given to secure the payment of bonds in an amount equal to the mortgage. The bill alleged default in the payment of interest due on these bonds on September 1st, 1938, and in the payment of taxes for the year 1938. Drawn in two counts, it prays, first, for the foreclosure of the mortgage, and second, for a decree for damages for waste alleged to have been committed or suffered by the defendant Warner Brothers Theatres, Inc., which corporation purchased the Towers Theatre from the mortgagor in May, 1930. The defaults in the mortgage as alleged in the bill were not denied, and the foreclosure of the mortgage, in so far as it affected the realty, was not contested. However, the validity of the mortgage as a chattel mortgage was challenged by the defendant Warner Brothers Theatres, Inc., and by a decree of this court advised by the late Vice-Chancellor Davis on April 24th, 1938, the issues on the complainant's bill of complaint were separated as follows:
1. The amount due on the mortgage in so far as it affected the real estate.
2. The validity of the mortgage as a chattel mortgage.
3. The question of waste.
Subsequent proceedings resulted in a decree of foreclosure dated May 4th, 1939, adjudging the sum of $101,391.32, plus interest and costs, to be due on complainant's mortgage. *Page 127 
Pursuant to that decree, the mortgaged real estate was sold by the sheriff of Camden County on June 30th, 1939, for the sum of $64,000, subject to delinquent taxes amounting to $7,458.04, the purchaser being a stranger to these proceedings. The admitted deficiency as of the date of the sheriff's sale was $40,893.31. Subsequently, the complainant filed another bill in this court to recover that deficiency from the defendant Warner Brothers, Inc., but, on motion to strike, the bill was dismissed by Vice-Chancellor Sooy on the ground that since this defendant had not assumed the mortgage debt when it purchased the mortgaged premises, it could not be held liable for the resulting deficiency. Tomlinson v. Warner Brothers Theatres, Inc.,126 N.J. Eq. 485.
Thereafter Vice-Chancellor Davis held complainant's mortgage invalid as a chattel mortgage because of formal defects in its execution.
The third issue, involving the question of waste, remained undisposed of at the time of Vice-Chancellor Davis' death, and the proofs touching this issue were taken before me. The waste for which complainant seeks to hold Warner Brothers Theatres, Inc., hereinafter referred to as the "defendant," liable, is charged in substance in the bill as follows:
a. By closing the theatre shortly after it bought it and keeping it closed, thereby preventing its being used as a theatre, and destroying the value of the land and the rentals, income, profits, c., of the mortgaged premises.
b. By removal of the marquee and the fire escapes, and by neglect and refusal to repair the building, as a result of which plaster fell from the walls and water came in through the roof ruining all the interior decorations, carpets, draperies, floorings, c., and caused all the metal work to become rusted, and all the woodwork, especially the balcony and roof supports, to become rotten.
c. By removing from the theatre certain personal property covered by the chattel mortgage and permitting the remainder to become ruined by water and dampness.
d. By failing to pay taxes as they accrued and by permitting an accumulation of such taxes in the sum of $4,368.80 at the date of the filing of the bill. *Page 128 
e. By neglecting and refusing to repair the building, the roof and the walls, so that the entire building, its equipment and fixtures, became completely worthless and of no value as security for the mortgage.
The following defenses were interposed by this defendant's answer:
1. Denial of the waste alleged.
2. Denial of any liability to pay taxes.
3. That complainant's mortgage was void as to fixtures and equipment therein mentioned.
4. That the fire escapes and the marquee were removed from the building because they were in a hazardous and dangerous condition.
5. That defendant has made necessary repairs, and that if the premises were not worth the amount of complainant's mortgage at the time of the sheriff's sale, that fact was due to reasonable wear and tear and a depressed real estate market, and other causes beyond defendant's control, and not because of any waste or act committed or permitted by defendant.
In view of this court's previous determination that the mortgage, in so far as it affected the chattels, was invalid for defects in execution, the question of the removal or damage to personal property need not be considered.
During the course of the final hearing I ruled that there was no obligation upon the defendant to keep the mortgaged premises in operation as a theatre, the mortgage itself being silent on this point and there being no evidence that the defendant had assumed any such obligation. In view of the conclusion touching the defendant's liability for waste at which I have arrived, this ruling need not be further considered, although such non-use might be considered as a species of ill husbandry which, according to respectable authority, constitutes actionable waste.67 C.J. 616 ¶ 12; 27 R.C.L. 1015 ¶ 5. And see OklahomaFarm Mortgage Co. v. Cesar (Oklahoma Sup. Court, 1936),62 Pac. Rep. 2d 1269, and First Trust Joint Stock Land Bank
v. Abekes (Iowa Sup. Court, 1938), 278 N.W. Rep. 183.
As counsel for complainant has stated in his reply brief, *Page 129 
complainant's action for waste against the defendant is not based upon any covenants in the mortgage, but depends entirely on the fact that the mortgagor or his grantee owed a duty to the complainant mortgagee not to impair the security of the mortgage; and that the defendant's failure to repair the premises, to pay taxes thereon, and the removal of said fixtures constituted such an impairment of the complainant's mortgage security as to amount to actionable waste. The primary question for determination is, therefore, whether or not the defendant, as the mortgagor's grantee, owed such duty to the complainant; and if so, to what extent it has violated that duty. That the defendant did owe such a duty to the mortgagee is, I think, readily deducible from all the authorities, otherwise the right of a mortgagee to enjoin waste by a mortgagor would not be so universally recognized.Capner v. Flemington Mining Co., 3 N.J. Eq. 467; Coggill v.Millburn Land Co., 25 N.J. Eq. 87; Fidelity Trust Co. v.Hoboken and Manhattan Railroad Co., 71 N.J. Eq. 14; Emmons v.Hinderer, 24 N.J. Eq. 39; Jackson v. Turrell, 39 N.J. Law 329;Schalk v. Kingsley, 42 N.J. Law 52; Lodge, Realty Mortgages inNew Jersey 121; 2 Jones on Mortgages 161 ¶ 846; Herman, Law ofMortgages and Real Estate 580 ¶ 410; 3 Tiffany, Real Property
(2d ed.) 2459 ¶ 618; Thomas on Mortgages 52; 19 R.C.L. 322
¶¶ 99-100; 5 Pom. Eq. Jur. (4th ed.) ¶ 1906.
The bill having been filed to foreclose a mortgage, there can be no doubt of this court's power to award damages for waste in view of the deficiency arising from the sheriff's sale. Jurisdiction has been retained in order to render complete justice. Tate v. Field, 56 N.J. Eq. 35; affirmed, 57 N.J. Eq. 632; Snider v. Freehold Theatre Co., 9 N.J. Mis. R. 85;Prudential Insurance Co. v. Guild, 64 Atl. Rep. 694; Lodge,Realty Mortgages in New Jersey 122; 3 Jones on Mortgages 478
¶ 2024; Lippincott v. Barton, 42 N.J. Eq. 272; 5 Pom. Eq. Jur.
¶ 1905.
A mortgage being, under our decisions, a mere security for a debt (Shields v. Lozear, 34 N.J. Law 496; Wade v. Miller,32 N.J. Law 296; Schalk v. Kingsley, supra), the mortgagor in possession is, in equity, the owner of the estate, and may *Page 130 
exercise all rights of ownership, even to the extent of committing waste. 2 Jones on Mortgages 165 ¶ 840; Thomas onMortgages 52; Tate v. Field, supra; 41 C.J. 620 ¶ 591;Coggill v. Millburn Land Co., supra; Kerr on Injunctions
¶ 81. But he may not commit or suffer such waste as will diminish the mortgagee's security and render it insufficient. Youle v.Richards, 1 N.J. Eq. 534; Capner v. Flemington Mining Co.,supra; Vervalen v. Older, 8 N.J. Eq. 98; Emmons v. Hinderer,supra; Coggill v. Millburn Land Co., supra; Higgins v.Chamberlin, 32 N.J. Eq. 566; Verner v. Betz, 46 N.J. Eq. 256;Tate v. Field, supra; Fidelity Trust Co. v. Hoboken andManhattan Railroad Co., supra; Jackson v. Turrell, supra;Schalk v. Kingsley, supra; Jersey City v. Kiernan,50 N.J. Law 246; Garrow v. Brooks, 123 N.J. Eq. 138; Elvins v.Delaware and Atlantic Telegraph and Telephone Co.,63 N.J. Law 243; Prudential Insurance Co. v. Guild, supra; Eisenberg v.Javas, 100 N.J. Eq. 326; and see, also, 41 C.J. 648 § 637; 5Pom. Eq. Jur. (4th ed.) 4319 § 1906; 2 Jones on Mortgages 160§ 846, and Tiffany on Real Property (2d ed.) 950, 969, 974,976, 2459 and 2464.
The defendant admits that its exercise of the rights of ownership of the mortgaged premises was subject to a limitation that it refrain from doing those acts which would impair the complainant's mortgage security and render it insufficient, but urges that this limitation is confined to voluntary or active waste, and does not apply to acts of omission, or permissive waste. Defendant further contends that the only voluntary or active waste charged is the removal of the marquee and the fire escapes for which it is not liable because their removal was due to their hazardous and dangerous condition; and that all other waste charged is permissive waste for which defendant as mortgagor is not liable. However, an analysis of the law of waste as recognized in this state will, I think, indicate that the point is not well taken.
There is not much dispute between the parties as to the law of waste in New Jersey, as indeed there cannot be in view of the many decisions of our courts touching that subject.
In 2 Blk. 281, waste is defined as "either voluntary, which *Page 131 
is a crime of commission, as pulling down a house, or it is permissive, which is a matter of omission only, as by suffering
it to fall for want of necessary reparations." (Italics mine.)
In 4 Pom. Eq. Jur. (4th ed.) ¶ 1348, the text reads as follows:
"Waste is the destruction or improper deterioration or material alteration of things forming an essential part of the inheritance, done or suffered by a person rightfully in possession by virtue of a temporary or partial estate, — as, for example, a tenant for life or for years. The rightful possession of the wrongdoer is essential, and constitutes a material distinction between waste and trespass." (Italics mine.)
In 67 Corp. Jur. 610 § 1, the text reads as follows:
"It may be defined to be any unlawful act or omission of duty
on the part of the tenant which results in permanent injury to the inheritance. It is the violation of an obligation to treat the premises in such manner that no harm be done to them and that the estate may revert to those having an underlying interest undeteriorated by any willful or negligent act." (Italics mine.)
And section 3, page 611:
"Permissive waste is waste permitted by the tenant, and consists in that negligence or omission to prevent injury to the inheritance or freehold as, for example, the suffering of thebuildings to fall into decay from neglect, or to be destroyed by fire through negligence." (Italics mine.)
And section 4, page 611, describes equitable waste as "such acts as a prudent man would not do in the management of his own property." This would include, I believe, acts of omission as well as acts of commission.
In view of the exhaustive treatment of the subject of waste in the opinion of Mr. Justice Depue in Moore v. Townshend,33 N.J. Law 284, it is unnecessary to here delve into the history of the law of waste. Suffice it to say that the statutes of Marlbridge and Gloucester therein referred to have been substantially re-enacted in this state. (R.S. 2:79-1 and 2.) By the decision of the Supreme Court in Moore v. Townshend,supra, the liability of a tenant for life or for years for permissive *Page 132 
waste was settled beyond question, and that liability has been frequently reaffirmed. Newbold v. Brown, 44 N.J. Law 266;Snider v. Freehold Theatre Co., supra; Calhoun v. Clark,9 N.J. Mis. R. 490; Schulting v. Schulting, 41 N.J. Eq. 130;Woolston v. Pullen, 88 N.J. Eq. 35; Haulenbeck v. Cronkright,23 N.J. Eq. 407; affirmed, 25 N.J. Eq. 513; and see27 R.C.L. 1021 ¶ 11; p. 1033 ¶ 22.
The fact that in England tenants for life are held not liable for permissive waste has apparently caused some confusion in the minds of counsel in the instant case. It was so held in In reCartwright (1889), 41 Ch. Div. 532; but even there a conflict of authority in England is recognized and discussed. And see 27 R.C.L. 1033 ¶ 22. However, we are interested only in the law of this state, and aside from the decisions of our courts already referred to, it would seem to me that our statute (R.S.2:79-2) is sufficiently explicit for the purposes of the instant case. In Newman v. Sanders, 89 N.J. Law 120, it was held that an action for permissive waste will lie under our statute of waste. And see Newbold v. Brown, supra; Freeman v. Headley,33 N.J. Law 523; Haulenbeck v. Cronkright, supra. That act (R.S. 2:79-2) reads as follows:
"No tenant for life or for years, or for any other term, shall, during the term, make or suffer any waste, sale or destruction of the houses, gardens, orchards, lands or woods, or anything belonging to the tenements demised without special license in writing, making mention that he may do it." (Italics mine.)
The statutory liability of tenants for life or for years for both voluntary and permissive waste has existed in this state since 1795, at least. Moore v. Townshend, supra; Nixon'sDigest (4th ed.) 1022. And there is here no suggestion that the defendant had any special license in writing as required by the statute. If, therefore, the law of waste as it applies to a tenant for life or for years also applies to a mortgagor, the rights of the complainant cannot be seriously disputed.
The general liability of a mortgagor to a mortgagee for waste resulting in the impairment of the security of his mortgage is sufficiently shown by the authorities cited above. *Page 133 
What constitutes waste as between a mortgagor and a mortgagee is ordinarily to be determined by the same considerations as apply to the question of waste between tenant and remainderman or reversioner. 3 Tiffany (2d ed.) 2459 ¶ 618. The mortgagor in this respect stands to the mortgagee as a tenant to the landlord or a tenant for life to a reversioner. Gooding v.Shea, 103 Mass. 360; Delano v. Smith, 206 Mass. 365;92 N.E. Rep. 500; Young v. Haviland, 215 Mass. 120; 102 N.E. Rep. 338.
If these propositions of law are sound, and I believe them to be, and, if a tenant for life or years is liable for permissive waste, as our cases hold (Moore v. Townshend, supra; Woolston
v. Pullen, supra; Schulting v. Schulting, supra; Smith v.Salvation Army, 104 N.J. Law 102), it follows that a mortgagor in possession is liable to a mortgagee for permissive waste which diminishes the mortgagee's security, and renders it insufficient. I have found but one direct authority in support of the defendant's argument that a mortgagor is not liable for such permissive waste, and the diligence of counsel has referred me to none. That authority is Tiedemann on Real Property 336 ¶ 351, where it is said:
"But a mortgagor is not guilty of waste, on account of acts of omission. In the absence of an express covenant to repair, he is not guilty of waste, as against the mortgagee, if he fails to keep the premises in repair."
The author cites Union Mutual Life Insurance Co. v. UnionMills Plaster Co., 37 Fed. Rep. 286, a decision of the United States Circuit Court (W.D. Michigan, 1889) as authority for the text. However, the case cited does not support the proposition stated. The question there involved was the appointment of a receiver on the ground, among others, of permissive waste by the mortgagor. The court found that the proofs failed to support the charge of waste — and that "the result of all the evidence is that no such destruction or waste of property as would on that account warrant the appointment of a receiver is shown." But the language of the court immediately following the above quotation — "to justify such an appointment the waste must be serious, and *Page 134 
the danger of destruction or impairment of the security
imminent" (citing cases); "In this case I am not convinced that the waste is other or more serious than would ordinarily occur to such property from mere disuse," indicates clearly, I think, that, except for the provisions of a local statute under which the Michigan courts had held the mortgagor entitled to the rents pending foreclosure and sale, waste resulting in an impairment of the mortgagee's security would have moved the court to the appointment of a receiver. (Italics in the above quotation mine.)
But whatever may be the law of Michigan as administered by the state or federal courts, there is no doubt but that in this state, where a mortgagor is guilty of either voluntary or permissive waste resulting in the impairment of a mortgagee's security, this court would appoint a receiver of rents at the instance of the mortgagee. One of the earliest cases in which this court appointed a receiver because of permissive waste is that of White v. Cramer, 3 N.J.L.J. 302. And see Rehberger
v. Wegener, 107 N.J. Eq. 391, where that and other mortgage receivership cases are reviewed. The law on this point is so well settled that it requires neither discussion nor citation of authorities. The mortgagee's right to compensation for waste, either voluntary or permissive, committed or suffered by a mortgagor, and which results in the insufficiency of the mortgagee's security, is grounded in the same principle that entitles a mortgagee to the appointment of a receiver where the mortgagor is guilty of such waste. There can be no distinction between the application of that principle to voluntary or to permissive waste.
While there may be some conflict of authority in other jurisdictions, and while "in modern times conflicting opinions have been expressed as to the liability of a tenant for years for permissive waste" (Blane v. Francis, 1 K.B. 252-257; and seeIn re Cartwright, supra), I think that in view of the decisions of our courts in Moore v. Townshend, Smith v. SalvationArmy, and other authorities supra, the question cannot now be considered an open one in New Jersey, and I therefore hold that a mortgagor in possession or his grantee who takes subject to the mortgage, who is guilty of permissive *Page 135 
waste resulting in the impairment of the mortgagee's security to the extent that it is insufficient is liable in damages to the mortgagee. That this is in accord with modern American decisions, see Oklahoma Farm Mortgage Co. v. Cesar, supra, and FirstTrust Joint Stock Land Bank v. Abakes, supra, and SyracuseSavings Bank v. Onondaga Silk Co., Inc. (New York Sup. Ct.,1939), 171 Misc. (N.Y.) 993; 14 N.Y.S. 2d 356.
In the briefs of counsel some difference of opinion as to the law of waste in the State of New York, and as to the proper construction of the decision of the New York Court of Appeals inVan Pelt v. McGraw, 4 Comst. (N.Y.) 102, is expressed, in view of which, I quote the following from the opinion of Mr. Justice Kimball in Syracuse Savings Bank v. Onondaga Silk Co.,Inc., supra:
"The complaint alleges that both voluntary waste andpermissive waste were committed by the defendant, and the action is brought to recover damages for such waste on the ground that the security of the mortgages has been impaired. There is no allegation in the complaint of insolvency by the defendant. * * *
"The cause of action alleged in the complaint is for the impairment of the security of the mortgages and was formerly called an action on the case in the nature of waste. Such an action whether against a mortgagor, a stranger, or other person seems to have been of ancient origin and came into use by reason of the exigencies of the particular set of circumstances, the law not being without a remedy for a wrong. In any case, such an action has been recognized in this state since the decision inVan Pelt v. McGraw, 4 N.Y. 110, in 1850. In that case the court said in part: `The defendant McGraw in this case, came into the possession of the land subject to the mortgage. The rightsof the holder of the mortgage were therefore paramount to hisrights, and any attempt on his part to impair the mortgage as asecurity was a violation of the plaintiff's rights. * * * Now this action is not based upon the assumption that the plaintiff's land has been injured, but that his mortgage as a security has been impaired. His damages, therefore, would be limited to the amount of injury *Page 136 
to the mortgage, however great the injury to the land might be. It could, therefore, be of no consequence whether the injury occurred before or after forfeiture of the mortgage. The action is clearly maintainable.'
"The decision in Van Pelt v. McGraw has been followed and recognized since that time. Morgan v. Waters, 122 App. Div. 340; 106 N.Y.S. 882; Ogden Lumber Co. v. Busse, 92 App. Div. 143; 86 N.Y.S. 1098; Cattle v. Wright, 140 Misc. 373;251 N YS. 699. * * *
"The essence of an action of this kind is the impairment ofthe security of the mortgage. The mortgagee is entitled to havehis mortgage security unimpaired by acts of the mortgagor or hisgrantee.
"In my opinion, there is nothing in reason or authority which would make a foreclosure or a foreclosure and sale or a deficiency judgment conditions precedent to the maintaining of such action and it has been so held where the action was brought against a stranger. No different rule should obtain where the acts complained of were committed by a mortgagor who necessarilyhad full knowledge of the mortgagee's lien and must be held to have known that waste would impair the security of that lien.
"The question as to whether the mortgagor is solvent or insolvent seems to me to be immaterial.
"The conclusion I have reached seems peculiarly applicable to the instant case where by virtue of the moratorium statutes now in force the plaintiff may not foreclose so long as the defendant pays the interest and taxes. It cannot be that an owner of real property may commit waste thereby impairing the security of the mortgage, and at the same time be heard to say that the mortgagee is helpless and has no remedy because the laws of this state do not permit a foreclosure." (Italics mine.)
The pertinency and application of that language to the instant case is obvious. In that jurisdiction it is not even necessary that the mortgage be foreclosed and a deficiency established to entitle a mortgagee to maintain an action for permissive waste against the mortgagor or his grantee in possession, where such waste results in the impairment of the *Page 137 
mortgage security. Indeed, such action lies against an entire stranger to the mortgage transaction. The reason that foreclosure and a deficiency judgment are not prerequisites is that the right of action is grounded, not upon an assumption of the mortgage debt, but upon the tortious conduct, either active or passive, of the mortgagor, or his grantee, who owes a duty to the mortgagee to maintain the security of his mortgage unimpaired.
It is the duty of a mortgagor to pay taxes and municipal liens and to keep down prior encumbrances. Stewart v.Fairchild-Baldwin Co., 90 N.J. Eq. 139; Schaffer v. Hurd,98 N.J. Eq. 143; Ripley v. Schenck, 96 N.J. Eq. 547; State MutualBuilding and Loan Association v. Milleville Improvement Co.,74 N.J. Eq. 721, 728; 41 C.J. 636 § 615; Farmer v. Ward, 75 N.J. Eq. 33; Nielson v. Heald, 151 Minn. 181; Mahon v. Crothers,28 N.J. Eq. 567; Warwick v. Hammell, 32 N.J. Eq. 427; Leeds v.Gifford, 41 N.J. Eq. 464; affirmed, 45 N.J. Eq. 245; Woolston
v. Pullen, supra. And there can be no distinction between the duty to pay taxes and the duty to make repairs. Failure to do either constitutes permissive waste. Woolston v. Pullen,supra. And see Central Trust Co. v. Chattanooga,94 Fed. Rep. 275 (at p. 281).
Relative to the physical damage to the theatre, the proofs disclose that the Towers Theatre was erected on Broadway, Camden, in 1913 and 1914, primarily for use as a vaudeville and "silent" motion picture theatre, and from that time until it was sold by the mortgagor to the defendant, with the exception of four months, the theatre was used for such purposes. The four months alluded to were the last four months during which the mortgagor was the owner and during which the theatre was used to show "talking" motion pictures, for which purpose an addition to the projection booth had been built and sound equipment installed. In December, 1929, the "talking" moving pictures were installed; in February, 1930, the premises were mortgaged to complainant, and in May, 1930, the defendant purchased the premises from the mortgagor, subject to the mortgage, and then closed the theatre, boarded up the entrances, removing the marquee and fire escapes, and removing certain equipment from the premises *Page 138 
for storage. The premises were thereafter practically abandoned by the defendant; apparently no caretaker was left in charge; doors were left or became open; the interior of the theatre was exposed to the elements and open to the depredations of petty thieves and trespassers who stripped it of practically everything of value that was movable; and it was not opened and used again as a theatre until the building had been completely renovated and modernized by the purchaser after the sheriff's sale in June, 1939.
The mortgagor testified that when he sold the theatre property to the defendant in 1930 the premises were in "good" condition throughout; that the roof, although six or seven years old, did not leak; that the heating system was in "working" order; that the fire escapes and marquee were still in good condition and useful; that the original plaster was on the ceiling and on all the walls and in good condition, and that the original seats and toilet facilities were still usable.
There is no appreciable variance in the testimony as to the physical condition of the Towers Theatre at the time of the sheriff's sale. Handle, the mortgagor, stated that he had not been in the theatre from the time he sold it until the fall of 1938, at which time it "looked to be in bad shape;" that "everything was wet, the plaster off — and you could see the sky" through the roof. Complainant and defendant each produced an experienced theatre architect to testify as to the condition of the premises at that time, and the complainant further produced a series of vivid and startling photographs showing the damage done to the interior and exterior portions of the theatre. Large sections of the ceiling in the main auditorium were bare of plaster, exposing the rafters through which the sky was plainly visible. Practically all of the plaster decorative molds in the ceiling had peeled off and disintegrated, as well as the ornamental cornices and mouldings along the box seats, the side walls and the face of the balcony. The most pronounced exposures in the roof were above the north end of the balcony, and through these for many years the rain and the snow had fallen to the balcony seats and flooring below. Here large sections of the balcony floor had rotted away, exposing the floor joists. The water had even *Page 139 
penetrated through the balcony floor, causing the plaster ceiling beneath to fall and disintegrate, and further causing the flooring of the main floor directly beneath to become watersoaked and rotten. The plaster on each of the side walls of the theatre was damaged, especially on the north wall. The paint on all the walls and what remained of the main ceiling and the ceiling beneath the balcony was either peeled off or hanging in scales. The seats which remained in the theatre, almost a third having been removed, were badly weather-beaten, especially those directly beneath the gaping holes in the roof. What electric fixtures remained were broken, and the main panel switchboard on the stage and the footlights were badly rusted. However, the projection room, the balcony stairways, the toilet rooms and the lobby did not seem damaged to such an extent but that a minimum of repairs and cleaning up would restore their former appearance. The plaster in the lobby and foyer needed only patching, although the paint had scaled off and the ornamental mouldings had crumbled to bits in most places. The two stores flanking the main entrance on Broadway, the restaurant above them, the front roof, the concrete, tile and terrazzo floors throughout the building, and the dressing and basement rooms appeared slightly damaged. It is quite evident that the theatre had been badly damaged by the elements which had apparently been allowed free play. There had been no attempt on behalf of the defendant to protect the property from these elements. This conduct on the part of the defendant was anything but that of a prudent owner (67 C.J. 611
¶ 4), and was in reckless disregard of the rights of the mortgagee. No owner who had the slightest desire to protect his investment would have been guilty of such gross negligence in caring for his property as is evidenced by the facts of this case. It is quite apparent that the defendant's only interest in the Towers Theatre was to remove it from competition with other similar places of amusement owned or controlled by it, and that the amount of the cash consideration which it paid over and above the amount of the mortgage debt was considered by it to be a fair price to pay for the elimination of such competition. *Page 140 
The measure of damages for waste is the diminution in the value of the mortgage security; that is, the difference between the value of the premises after the commission of the waste and the value in the absence of such waste. Prudential Insurance Co. v.Guild, supra; Jackson v. Turrell, supra; Schalk v. Kingsley,supra; Jersey City v. Kiernan, supra; Tate v. Field, supra;Fidelity Trust Co. v. Hoboken and Manhattan Railroad Co.,supra; Eisenberg v. Javas, supra; 41 C.J. 620; Lodge, RealEstate Mortgages in New Jersey 122 ¶ 81. The damage is the amount the mortgaged premises would have sold for at foreclosure sale, had the waste not been suffered or committed, in excess of what they actually sold for. Prudential Insurance Co. v.Guild, supra.
In view of my finding that the defendant grantee of the mortgagor is liable for permissive waste, it is not necessary that the waste committed be classified either as voluntary or permissive.
As already stated, the premises were purchased at the sheriff's sale for the sum of $64,000 by a stranger to these proceedings. The sale was subject to taxes in the sum of $7,458.04. The actual sales price, therefore, was $71,458.04. Field v. Thistle,58 N.J. Eq. 339. To show what these mortgaged premises would have sold for had the waste described not been committed or suffered, the complainant produced three Camden realtors and an experienced theatre architect whose qualifications as experts were admitted; and the defendant produced two Camden realtors and an experienced theatre architect, whose qualifications as experts were likewise admitted. They testified touching the value of the property in its dilapidated condition at the time of the sheriff's sale, its value as it would have been in the absence of waste, the cost of the necessary repairs to put the theatre building in the condition in which it would have been without the waste, and the amount the property would have sold for at the sheriff's sale had such waste not been committed or suffered. These experts also gave estimates as to the value of the land on which the theatre was built and which was covered by the mortgage, and also the replacement value of the building at the date of the sheriff's sale. Complainant's *Page 141 
expert valued the land at $25,763.40 and the defendant's experts valued it at $21,790, a difference of $3,973.41. The complainant's experts estimated the replacement value of the building at $130,329 and the defendant's experts estimated such value at $144,224. The total replacement value of both land and building, according to complainant's experts, would be $155,092.40, and according to defendant's experts, $166,014. Thus it will be seen that the defendant's experts fixed the replacement value at approximately $11,000 higher than that fixed by the complainant's experts. However, the complainant's architect estimated that the cost of the necessary repairs to the theatre building, in order to put it in the condition in which it would have been had no waste occurred, would be $29,095, and with this figure the three real estate experts who testified on behalf of the complainant agreed. On the other hand, the defendant's architect testified that the cost of the necessary repairs to put the building in the condition in which it would have been had not the waste occurred would have been $2,300, and with this estimate the two real estate men produced on behalf of the defendant agreed. However, I am unable to understand how the defendant's architect arrived at any such figure. He made no plan of the building and had no reliable data which he could offer to the court in support of that estimate; nor was his estimate consistent with other figures submitted by him for individual items of repairs. For instance, he gave the following estimates of the cost of individual items:
 Roof ......................... $750.00
 Plastering ................... 500.00 — $600.00
 Paint ........................ 2,500.00 — 3,000.00
 Heating ...................... 1,200.00
 Electric fixtures and wiring, 100.00
 Plumbing ..................... 400.00
 Carpentry .................... 300.00
 Fire escapes ................. 600.00
 Marquee ...................... 1,000.00 — 1,200.00
 Hole in floor ................ 75.00
 Scaffolding .................. 1,500.00

or totals of $8,925 or $9,725, depending upon whether the lowest or the highest estimate for the individual items is *Page 142 
accepted; and this in spite of the fact that he testified that the necessary repairs would not cost more than $2,300. Although this architect supervised the renovation and alteration of the theatre building after the sheriff's sale, involving an expenditure of approximately $80,000 by the purchaser, I was unimpressed by his testimony as to the cost of the necessary repairs to put the property in the condition it would have been in without the waste, and I reject his testimony in favor of that of complainant's architect.
The three real estate experts who testified on behalf of the complainant testified that the value of the mortgaged premises had not the waste been suffered or committed, would have been $104,000, on the date of the sale. These three experts, as to whose qualifications there can be no question, collaborated with one another in making up the estimate of the damage resulting from the waste, cost of necessary repairs to remedy that waste, and the value of the land and building had the waste not been committed. Each one of these witnesses testified that had the waste not been committed the property would have sold for $104,000. Complainant's expert witness Chalmers testified that his firm had advised the purchaser at the sheriff's sale, and that a representative of the firm attended the sale and actually bid in the property for the purchaser; and that throughout the whole transaction the purchaser acted pursuant to his advice. And he further testified that had such waste not occurred, and had the building been in the condition in which it should have been without the waste, he would have advised his client to bid $35,000 above the purchase price at the sheriff's sale had it been necessary to do so. This would have brought the purchase price up to $106,458.04, and it was his opinion, and that of the complainant's other experts, that at such sale without the waste the mortgaged property would have sold at $104,000. As opposed to this testimony the defendant's two real estate experts testified that in their judgment the property in the absence of waste would have had a value on the day of the sheriff's sale of only $63,000, and that in the condition in which it was sold it was not worth more than $60,000 notwithstanding the fact that it actually sold for a sum in excess of $71,000. *Page 143 
It is a difficult matter to choose between expert witnesses touching real estate values, and especially touching sheriff's sale values or possible purchase prices at such sales. Within the past decade there has been little or no market and practically no competitive bidding at sheriff's sales. But this case seems to have been an exception to the rule, as there was evidently spirited bidding at this sale by strangers to the foreclosure proceeding.
How much higher the property would have been bid had it been in the condition in which the mortgagee had a right to have it at that sale is more or less a matter of conjecture; but in view of the fact that the bidders at the sale bid the property up to the amount of its then real value or more, it is at least permissible to assume that those same bidders would have bid the property up to its actual worth had the property been in the condition in which the mortgagee had a right to have it at that sale. And in view of the fact that the witness Chalmers was the advisor of the purchaser at the sheriff's sale and that he testified that he would have advised his client to bid $35,000 more than he did bid for the property, if it were necessary to do so, I feel bound to accept the price of $104,000 which complainant's experts testified the property would have sold for had not the waste been committed and if the premises were in proper condition on the date of the sale, and to fix the amount of the difference between the bid of $64,000 at which they were struck off and sold by the sheriff and $104,000, or $40,000, as the amount of damages to which the complainant is entitled by reason of the waste done or suffered by the defendant. While the actual selling price at the sheriff's sale was $64,000, the amount of the high bid, plus delinquent taxes of $7,458.04, subject to which the premises were sold, or $71,458.04, these unpaid taxes constitute an item of waste whereby the security of complainant's mortgage was diminished and for which it is entitled to be compensated in damages. Although the delinquent taxes constituted a part of the purchase price (Field v. Thistle, supra), they were paid by the purchaser to the municipality and not to the complainant mortgagee. Complainant's actual damage, therefore, is the difference between the highest *Page 144 
bid of $64,000 and $104,000, the price at which the property should have sold, and not the difference between the actual purchase price of $71,458.04 and $104,000. I will advise a decree accordingly.